UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
VITOL S.A., INC.,                                        MEMORANDUM DECISION
                          Plaintiff,                          AND ORDER
                                                         01CV2184 (GBD)

                 -against-

KOCH PETROLEUM GROUP, LP,

                          Defendant.
---------------------------------------------------------x
GEORGE B. DANIELS, District Judge:

  In an action for breach of contract and estoppel,[1] plaintiff moved for summary judgment

in its favor on its breach of contract claim and dismissing defendant's affirmative defenses in

their entirety.  Defendant moved for summary judgment dismissing plaintiff's breach of contract

claim.  The plaintiff's motion is granted and the defendant's motion is denied.

  The gravamen of the complaint is that defendant allegedly breached its sales contract with

plaintiff by failing to timely deliver the oil, purchased by plaintiff, to the barge nominated by

plaintiff.  Plaintiff contends that, in accordance with the buyer's option provision, in the parties'

agreement, plaintiff demanded defendant to physically deliver the oil on February 3rd.  Plaintiff

contends that defendant breached the contract by: (1) anticipatory repudiation in that defendant

failed to give plaintiff adequate assurance of its February 3rd performance; and (2) failing to make

timely delivery of 75,000 barrels of heating oil on February 3rd or 4th.  Defendant, however,

maintains that the buyer's option provision did not afford plaintiff the right to select a specific

---

[1] By Stipulations and Orders of Voluntary Partial Dismissal, plaintiff withdrew, with
prejudice, its second cause of action for indemnity, and defendant withdrew, with prejudice, its
sole counterclaim.

1

delivery date for the actual physical delivery, and hence defendant did not breach the contract because it timely delivered the oil within the time frame specified in the contract.

The parties are companies who are involved in the purchase and sale of oil products. On January 13, 2000, the parties entered into an agreement whereby defendant sold to plaintiff 100,000 barrels of No. 2 heating oil to be delivered to the New York Harbor between February 3rd and February 5th. Plaintiff contends, and defendant does not dispute, that plaintiff purchased 3.15 million gallons of home heating oil as there is approximately forty-two gallons of oil in a standard barrel.[2] (Pl.'s Mem. at 11, & n.27).

On January 14th, a confirmation of the terms of the sale was sent by plaintiff's broker to defendant. With respect to the delivery provision, the confirmation states, "LIFTING[3] VIA BUYER'S BARGE FOB [Free on Board] SELLER'S SHORE TANKS NEW YORK HARBOR DURING THE PERIOD FEBRUARY 2-5, 2000."[4] Plaintiff acknowledges that, even when a broker is involved, the common practice, in the oil trade business, is for the seller to issue the operative written contract. On January 17th, defendant sent plaintiff a contract confirming the parties' January 13th transaction. The delivery provision of the contract states:

FOB (INCO-TERMS[5] 1990) ONE SAFE PORT/BERTH AT NEW YORK

_____

[2] The oil was sold at the price of $0.906 per gallon.

[3] Plaintiff asserts that the term "lifting" has a standard industry meaning. Plaintiff relies on the definition provided in *Platt's Oil Guide and Specifications* which defines the term "lifting" as, "Tankers and barges loading petroleum at a terminal or transfer point." Defendant does not contest that this is the acceptable definition for lifting within the oil industry nor does defendant provide an alternative definition.

[4] There is no dispute that the delivery time frame specified in the broker's transmission was inaccurate, and that the correct delivery window was February 3rd - February 5th.

[5] "INCO-TERMS" refers to the International Chamber of Commerce Official Rules.

2

HARBOR BY BARGE DURING FEBRUARY 3, 2000 - FEBRUARY 5, 2000. BUYER'S VESSEL/BARGE SHALL BE ACCEPTABLE TO SELLER.  SUCH ACCEPTANCE SHALL NOT BE UNREASONABLY WITHHELD.

Pursuant to the FOB provision, plaintiff was obligated to nominate the barge that would lift the cargo and defendant was obligated to nominate the terminal where the cargo would be available.  The contract states that defendant's general contractual provisions, which were not in conflict with the parties' specific agreed-upon terms, are incorporated by reference into the agreement.  Within defendant's standard provisions was a force majeure clause which provided that where a party was rendered unable to perform a particular contractual obligation, due to the occurrence of an event over which that party had no control, such performance of that obligation was excused during the pendency of the event.[6]

Plaintiff advised defendant that it was in agreement with the conditions and terms outlined in defendant's proposed contract except for certain enumerated changes plaintiff was seeking.  With regard to the delivery provision, plaintiff only requested that the "incoterms 1990" provision be amended to read "incoterms 2000."  Plaintiff failed to realized that the lifting at the buyer's option language was not included in the written contract.

On January 19th, six days after plaintiff concluded the contract for the purchase of oil from defendant, plaintiff sold the 100,000 barrels of oil it was to receive from defendant, to

---

[6]  The force majeure clause reads, in pertinent part:

If either party is rendered unable, wholly or in part, by "force majeure" or any other cause of any kind not reasonably within its control to perform or comply with any obligation or condition of this Agreement, upon giving notice and reasonably full particulars to the other party, such obligation or condition shall be suspended during the continuance of the inability so caused, and such party shall be relieved of liability and shall suffer no prejudice for failure to perform during such period . . .

3

Castle Oil Corporation ("Castle").  The plaintiff/Castle agreement required delivery during the period of February 1st through February 3rd.  On or about January 25th, as the time for defendant's performance drew near, plaintiff informed defendant that the oil was to be delivered to Castle instead of to plaintiff.  On that date, plaintiff passed on to defendant the nomination by Castle of the barge B-80 to load 75,000 barrels on February 1st, with the remaining 25,000 barrels to be lifted by a "TBN" ("To be Named") barge.  Defendant responded that it could not load before February 3rd, the first day of the delivery period specified in the contract between plaintiff and defendant.  On January 26th, plaintiff orally nominated barge B-80 to load 75,000 barrels on February 3rd, and the barge B-100 to load the remaining barrels the same day.  During the next few days, plaintiff followed up with defendant to see if defendant was prepared to nominate the terminals where the oil could be lifted onto the nominated barges.

On February 1st, without notice to plaintiff, defendant approached Castle directly and asked if it would push back the delivery date for the first 75,000 barrels due to February 7th or 8th.  Castle refused defendant's request for a delay in delivery, citing its immediate need for delivery of the heating oil.[7]  On February 2nd, despite the fact that defendant did not have the 75,000 barrels available to load, defendant accepted Castle and plaintiff's nomination of the barge B-80 to lift the 75,000 barrels at the IMTT Terminal at Bayonne, New Jersey, at 1200 hours on February 3rd.  Defendant contends that the nomination of the barge B-80 was invalid because the B-80 was not in New York on February 2nd or February 3rd.

On February 2nd, plaintiff's trader informed defendant's trader that defendant was to

_____

[7]  Toward the end of January, New York City was experiencing a period of cold weather causing heating oil prices to rise as supply lessened and demand increased.

4

deliver 75,000 barrels of oil to Castle by midnight on February 3rd or risk being in breach of contract. Plaintiff's trader advised that Castle was threatening to purchase cover cargo at a significantly higher price if defendant refused to give assurance of performance with regard to the delivery of oil by midnight on February 3rd. Defendant's trader repeatedly indicated that defendant was not in breach of contract, and further indicated that defendant was attempting to make the February 3rd delivery date. Defendant's trader, however, did not provide any assurance of performance as requested by plaintiff's trader.

Defendant could not deliver the oil to plaintiff or Castle on February 3rd. Plaintiff alleges, and defendant denies, that as a result of plaintiff's urging, on the afternoon of February 2nd, plaintiff's trader convinced Castle, on a without prejudice basis, to accept delivery of the 100,000 barrels on February 4th. Defendant does admit that on February 2nd, there was an agreement to nominate the barge B-80 to load on February 4th; the cargo stem of 75,000 barrels was split to be loaded at two terminals; and that plaintiff and defendant issued written barge/cargo stem nominations. The first delivery was to be at GATX Terminal in Cataret, New Jersey at an estimated time of arrival of 1400 hours, and the remaining barrels were to be delivered at the IMTT Terminal at an estimated time of arrival of 1800 hours.

Plaintiff issued a written Notice of Protest, dated February 2nd, to defendant as a result of defendant's inability to load the cargo on February 3rd. In the Notice, plaintiff indicated that it had made it clear to defendant that the oil must be loaded by February 3rd. Plaintiff further noted that defendant failed to comply with its contractual obligation to provide timely delivery, and hence plaintiff declared defendant to be in breach of contract. Additionally, plaintiff advised defendant that it would take all necessary and appropriate action to protect plaintiff's interests

5

and to hold defendant fully liable for any and all resulting damages.

On February 3rd at approximately 0950 hours, a barge struck a marine berth at the GATX Terminal causing cargo operations to cease for a few hours, which in turn caused the terminal to endure a slowdown.  On the morning of February 4th, the day after the dock accident, defendant's scheduler confirmed the nomination of the GATX Terminal for the loading of 54,000 of the 75,000 barrels of heating oil on the barge B-80.  During the afternoon of February 4th, defendant informed plaintiff that the nominated Castle barge B-80 would not, as promised, be able to begin loading the 75,000 barrels at the GATX Terminal prior to midnight that evening.  The best information available from that terminal was that the loading could not begin until sometime the morning of February 5th.  Defendant contends that since the GATX Terminal employees and outside contractors were working to repair the collision damage on an expedited basis, both plaintiff and the terminal's schedulers, as of the close of business on February 4th, expected the barge B-80 to be called into the terminal sometime during the night of February 4th.  Defendant's scheduler testified, at her deposition, that when she confirmed the nomination on the morning of February 4th, she was aware of the accident that had occurred at the GATX Terminal, and that there was some uncertainty as to the availability of a berth.

Before midnight on February 4th, defendant had the cargo in place to be lifted.  On the afternoon of February 4th, however, the barge B-80's scheduling personnel advised Castle that unless the B-80 commenced loading operations by midnight, the barge owner would cancel the B-80.  Plaintiff relayed this information to defendant at 1805 hours.  At 1900, Castle cancelled the barge B-80 without informing plaintiff of the cancellation.  At about 2145, the GATX Terminal scheduling personnel, unaware that the barge B-80 had been cancelled by Castle,

contacted the B-80's scheduling personnel to convey an order to bring the B-80 to the GATX

Terminal on February 5th at 0200, as that was when the dock would be ready.  At about 2215 on

February 4th, plaintiff advised defendant that the barge B-80 had been cancelled.  Both parties'

attempts to locate a substitute barge to load the 75,000 barrels of oil proved unsuccessful.[8]

By fax dated February 4th, plaintiff indicated to defendant that it had learned that the oil

would not load until February 5th which "is completely unacceptable to [plaintiff] . . . and is in

breach of our contract . . . [P]laintiff holds [defendant] responsible for all costs and consequences

of this non-performance, including, but not limited to, the cost borne by [plaintiff] entering the

spot market to provide alternate cover for this requirement."  (Kailas Aff. Ex. 15 at 2).

On February 4th, sometime between the hours of 1700 and 1830, Castle arranged to

purchase approximately 75,000 barrels of No. 2 heating oil from another seller.  The newly

purchased oil was scheduled to arrive in New York Harbor late on February 6th or early on

February 7th.  On February 5th, plaintiff inquired of Castle whether it considered its recently

purchased cargo as cover/replacement for the plaintiff/Castle contract.  At that time, Castle had

not decided whether the new cargo was a cover/replacement cargo.  On Monday, February 7th at

approximately 1030, Castle issued a written notice to plaintiff cancelling the plaintiff/Castle

contract.  On February 7th from the opening of the market at 0900 through at least 1030, plaintiff

could not sell the oil, belated delivered by defendant, to a potential third party buyer because this

cargo was still dedicated to the plaintiff/Castle contract.

---

[8]  With regard to the remaining 25,000 barrels of oil, on February 5th, defendant
completed delivery at the Coastal Bayonne Terminal to the barge B-15.  Castle accepted these
25,000 barrels, and hence this is not part of plaintiff's claims against defendant.  The present
litigation only concerns the late delivery of the 75,000 barrels of oil.

Fifty-five thousand barrels of the subject cargo, at the GATX Terminal, was ultimately delivered to plaintiff and loaded onto the barge B-80 on February 9th.  Also on February 9th, approximately 20,000 barrels of the cargo of oil, at the IMTT Terminal, was delivered to plaintiff in the form of an internal shore tank pump-over transfer, instead of being physically loaded onto a barge.

On February 13th, plaintiff's broker sent the parties a request that the delivery clause of the parties' contract be amended to read: "LIFTING VIA BUYER'S BARGE FOB SELLER'S SHORE TANKS NEW YORK, DURING THE PERIOD FEBRUARY 3-5, 2000 LIFTING AT THE BUYER'S OPTION." The communication further noted that, "THIS DEAL WAS ALWAYS BUYER'S OPTION."  Defendant did not respond to the request for an amendment of the delivery provision.

Thereafter, Castle commenced an arbitration proceeding against plaintiff for breach of contract, and was awarded $1,700,656.68 in damages.[9]  Plaintiff commenced the instant action seeking to recover the losses it claims to have incurred as a result of defendant's alleged breach of contract.

In paragraph nine of plaintiff's complaint, it states that, "[p]ursuant to the Purchase Contract terms, [defendant] was obligated to deliver the No. 2 oil in New York Harbor to buyer's nominated barge between February 3 and February 5, 2000, with the lifting to be 'at buyer's option.'"  In defendant's answer, defendant "[d]enies the allegation contained in paragraph 9, except admits that the Purchase Contract window was February 3/5 2000 'at buyer's option.'"

---

[9]  The arbitration award reflects that Castle was to recover $1,700,656.68 in damages, which is the amount of the award that plaintiff states in its complaint and defendant admits to in its answer.  Plaintiff's Rule 56.1 Statement, however, indicates that the arbitration award was $1,700,656.63.  The difference of five cents appears to be a typographical error.

Defendant concedes, that by admitting the existence of the buyer's option provision in its answer, it has thereby accepted that contract term.

## ANALYSIS

Summary judgment, pursuant to Rule 56, is warranted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  A genuine issue for trial exists if, based on the record as a whole, a reasonable trier of fact could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The burden to show that there are no genuine issues of fact rests with the party seeking summary judgment.  Anderson, 477 U.S. at 256; Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995).  "When deciding a summary judgment motion, a trial court's function is not to weigh the evidence, make credibility determinations or resolve issues of fact, but rather to determine whether drawing all reasonable inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could find in the non-moving party's favor."  Beatie v. City of New York, 123 F.3d 707, 710 (2d Cir. 1997) (internal citation omitted); see also, Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)).  The weighing of evidence and the assessment of credibility are matters that lie exclusively within the province of the finder of fact, not the Court.  Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996) (citing United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994)).

Although defendant acknowledges the existence of the buyer's option, defendant disagrees with plaintiff's interpretation of the provision as affording plaintiff the right to

designate a specific date, within the delivery window, to insist on strict adherence that defendant physically deliver the oil to the nominated barge on that date.  Defendant contends that the buyer's option required defendant to accept plaintiff's nomination of the barge for a specific date, within the delivery window, and defendant would incur any additional costs associated with the delay in loading the cargo beyond the date chosen by plaintiff.  In other words, the buyer's option shifted the demurrage[10] exposure onto defendant, as the FOB seller, for any additional demurrage charges incurred beyond the laytime[11] set forth in the contract.

An examination of the parties' agreement reveals that the buyer's option provision afforded plaintiff the contractual right to demand that defendant deliver the oil on a specific date within the agreed-upon delivery range.  Under Kansas law,[12] "[a] cardinal principle of contract

---

[10]  Demurrage is the fee levied on the defendant-seller for the delay, in excess of the agreed-upon time period for the loading of cargo on plaintiff's nominated barge.  See eg., Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 386 n.2 (2d Cir. 2000) (citing Black's Law Dictionary 432 (6TH ed. 1990)); Status Int'l S.A. v. M & D Maritime Ltd., 994 F.Supp. 182, 185 n.2 (S.D.N.Y. 1998); In the Matter of Arbitration between Carina Int'l Shipping Corp., 961 F.Supp. 559, 559 n.1 (S.D.N.Y. 1997); Larsen v. A.C. Carpenter, Inc., 620 F.Supp. 1084, 1120 (E.D.N.Y. 1985) (citations omitted), aff'd, 800 F.2d 1128 (2d Cir. 1986); Hellenic Lines, Ltd. v. Dir. Gen. of the Indiasupply Mission, 319 F.Supp. 821, 831 (S.D.N.Y. 1970) aff'd, 452 F.2d 810 (2d Cir. 1971).

[11]  "Laytime" is the amount of time the parties agreed to accomplish the loading of cargo onto plaintiff's nominated barge.  The defendant-seller will incur demmurage costs in the event the cargo is not loaded onto plaintiff's barge within the specified laytime set forth in the parties' contract.  See eg., A/S Dampskibssetskabet Torm v. United States, 64 F.Supp.2d 298, 311 (S.D.N.Y. 1999) (quoting 2A STEVEN F. Friedell, Benedict On Admiralty § 201, at 18-1 (7th ed. (rev.) 1999)); Larsen, 620 F.Supp. at 1119-20 (E.D.N.Y. 1985) (citation omitted); Pan Cargo Shipping Corp. v. United States, 234 F.Supp. 623, 636 (S.D.N.Y. 1964), aff'd, 373 F.2d 525 (2d Cir. 1967).

[12]  The parties' contract included a choice of law provision providing that the agreement is to be governed by and construed in accordance with the laws of the State of Kansas, and the federal law except for the United Nations Convention for the International Sale of Goods.  Both parties acknowledge that the substantive law of Kansas governs the contract.  They each note that

law is that in the absence of fraud or mutual mistake, a clear and unambiguous contract must be

enforced according to its terms." Fast v. Kahan, 481 P.2d 958, 961 (Kan. 1971).  Both the

interpretation and legal effect of an unambiguous contract are matters of law for the Court to

decide.  City of Topeka v. Watertower Place Dev. Group, 959 P.2d 894, 898, 899 (Kan. 1998);

Wood River Pipeline Co. v. Willbros Energy Servs. Co., 738 P.2d 866, 868-69 (Kan. 1987)

(quoting Hall v. Mullen, 678 P.2d 169, 174 (1984)).  A contract is ambiguous if it contains

provisions or language of doubtful or conflicting meaning as gleaned from a natural and

reasonable interpretation of its language.  Marquis v. State Farm Fire & Cas. Co., 961 P.2d 1213,

1219 (Kan. 1998); Weber v. Tillman, 913 P.2d 84, 96 (Kan. 1996); Simon v. Nat'l Farmers Org.,

Inc., 829 P.2d 884, 888 (Kan. 1992); Patrons Mut. Ins. Assoc. v. Harmon, 732 P.2d 741,746

(Kan. 1987).  Merely because the parties disagree as to the meaning of a contractual provision

does not compel a finding that there is an ambiguity in the parties' contract.  TMG Life Ins. Co.

v. Ashner, 898 P.2d 1145, 1154 (Kan. Ct. App. 1995).  In the case at bar, although the parties

have differing interpretations of the buyer's option provision, neither party is claiming that the

contract is ambiguous, nor does the Court find that the contract is ambiguous.

Where the terms of the contract are plain and unambiguous, both the intention of the

parties and the meaning of the contract are to be determined from the contract itself.  Wolfgang

v. Mid-America Motorsports, Inc. 111 F.3d 1515, 1524 (10th Cir. 1997); Zukel v. Great West

Managers, LLC, 78 P.3d 480, 483 (Kan. Ct. App. 2003) (citation omitted); TMG Life Ins., 898

---

the laws of both Kansas and New York are consistent with regard to the issues to be resolved in
determining their motions.  (Pl.'s Mem. at 11 n.26; Def.'s Mem. at 12 n.5).  Additionally, the
parties agree that their contract dispute is governed by the Uniform Commercial Code ("UCC").
(Pl.'s Mem. at 2; Def.'s Mem. at 12).

P.2d at 1154.  The primary rules of contract construction requires the Court to construe all the contract  provisions together in harmony, rather than conducting a critical analysis of a single or isolated provision, and reasonable, as oppose to unreasonable, interpretations are favored.  Time Warner Entertainment Co., L.P. v. Everest Midwest Licensee, L.C.C., 381 F.3d 1039, 1046, 1044-45 (10th Cir. 2004); In re Cherokee County Revenue Bonds, 946 P.2d 83, 91 (Kan. 1997) (quoting Metro. Life Ins. Co. v. Strnad, 876 P.2d 1362, 1371) (Kan. 1994)); Starr v. Union Pacific R.R. Co., 75 P.3d 266, 269 (Kan. Ct. App. 2003).   All the provisions of the contract are to be construed in such a manner that they are consistent with one another so that all provisions can be given effect.  Jenkins v. T.S.I. Holdings, Inc.,1 P.3d 891, 899 (Kan. 2000) (citation omitted).  The words of the agreement are to be given their plain, general, and common meaning and, where technical words are used, they are to be given their technical meanings unless the surrounding circumstances indicate otherwise.  Neustrom v. Union Pacific R.R. Co., 156 F.3d 1057 (10th Cir. 1998) (quoting Hall v. JFW, Inc., 893 P.2d 837, 840 (Kan. Ct. App. 1995)); United States v. Kansas Gas & Elec. Co., 215 F.Supp. 532, 542 (D.Kan. 1963);  Wood River Pipeline, 738 P.2d at 871; K & E Drilling Inc. v. Marren, 340 P.2d 919, 923 (Kan. 1959).

In the case at bar, the application of the foregoing rules of construction to the parties' contract leads to only one reasonable construction of the buyer's option provision; that is, it gave plaintiff the right to demand the physical delivery of the oil on a specific date within the agreed-upon delivery window.  The delivery provision, of the parties' contract, requires that delivery be made FOB, as that term is defined in the 2000 Incoterm Rules.  Section FOB A4, of the Incoterm Rules of 2000, states that, "The seller must deliver the goods on the date or within the agreed period at the name port of shipment and in the manner customary at the port on board the vessel

12

nominated by the buyer."  The Incoterm 2000 preamble provides, in pertinent part, "'Free on Board' means that the seller delivers when the goods pass the ship's rail at the named port of shipment."  ICC Publication 560 - Incoterm 2000.  Thus, in accordance with section A4, the seller is obligated to deliver the goods not merely at the terminal or port, but rather delivery is accomplished only when the goods are loaded onto the buyer's nominated vessel, *i.e.*, passes the ship's rail.  Therefore, an incoterm FOB delivery requires the seller to deliver the goods on board the vessel.  Lifting of the oil was to be at the buyer's option.  Lifting refers to the loading of petroleum at a terminal or transfer point.  Since defendant's obligation to deliver the oil required defendant to load the cargo onto the plaintiff's nominated barge, and since plaintiff had the option to designate the date for the loading of that oil from the terminal onto the barge, the buyer's option provision must be interpreted as affording plaintiff the right to demand the physical delivery of the oil on a specific date within the delivery window of February 3rd and February 5th.

Defendant, however, argues that such an interpretation is inconsistent with the purpose and intent of the contract.  Defendant, citing to the notice provision of the agreement, claims that the contract expressly contemplates a narrowing of the delivery window by mutual agreement through consultation and coordination with the barge owner and the terminal operator.  Additionally, defendant contends that interpreting the buyer's option to mean the plaintiff has the unfettered right to demand, at anytime, the immediate delivery of the cargo nullifies the delivery window, of February 3rd - February 5th, because defendant would have to be in a position to deliver the oil by midnight on February 2nd in case plaintiff advised defendant that delivery was to occur at one minute after midnight on February 3rd.  Defendant further maintains that such an

interpretation is inconsistent with the realities of the oil industry because defendant has no control over the operations associated with the loading of the cargo, especially where the transaction is to occur at a public terminal.

In arguing that the contract envisions the narrowing of the delivery window by the parties' mutual agreement, defendant erroneously relies on the first portion of the notice provision which states, "[a]s soon as practical after establishment of this contract, the parties shall consult with each other to narrow the contractual delivery laydays to a 24-hour period acceptable to both parties considering delivery vessel schedule and receiving terminal schedule." The cited contractual language pertains solely to situations where the oil is being delivered by vessel to be unloaded at a receiving terminal. In the instant case, however, defendant was to have the oil available at the terminal to be loaded upon a receiving vessel. Accordingly, that portion of the notice provision of the contract is inapplicable to the case at bar.

The "deliveries" provision of the contract does require plaintiff to provide reasonable notification in advance of its demand for delivery. That clause states, in relevant part, that "[t]he receiving party shall furnish reasonable advance notice with respect to the particulars of each delivery." Thus, plaintiff could not unilaterally and unreasonably demand immediate delivery without giving prior notice. In fact, plaintiff provided defendant with ample notice as plaintiff orally nominated barges on January 26th, to load the cargo on February 3rd. Defendant is a sophisticated oil company who has full knowledge of the realities of the oil industry, including the difficulties encountered when utilizing a public terminal. Defendant, endowed with such knowledge, assured plaintiff that it would make delivery on February 3rd. Defendant's failure to make timely delivery on February 3rd was not due to terminal congestion or other delay at the

14

public terminals, but rather was simply because defendant did not have the requisite barrels of oil in its possession to fulfill its contractual obligations.

Having concluded that plaintiff was entitled to demand delivery on February 3rd, the Court finds that defendant breached the contract by failing to delivery the oil on February 3rd, when performance was due, or on February 4th, the date that plaintiff and Castle agreed to accept late delivery.[13]

Pursuant to the perfect tender rule, "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest."  KAN. STAT. ANN. § 84-2-601. Under the perfect tender rule, a buyer is entitled to reject goods untimely delivered when the time is of the essence.  See, George E. Warren Corp. v. Olco Oil Co., 1988 WL 28940, at *3-4 (N.D.N.Y. Mar. 15, 1988); Steuart Petroleum Co. v. Salomon, Inc., 1989 WL 100517, *8 (Del. Super. Aug. 21, 1989), aff'd, 588 A.2d 1142 (Del Supr. 1991).  "Where a definite time of performance is specified in a contract, time is of the essence unless the circumstances affirmatively indicate a contrary intent."  See, Sparks v. Stich, 522 N.Y.S.2d 707, 709 (N.Y. App. Div. 1987) (citing 22 N.Y. Jur.2d, Contracts, §§ 247, 248 at 97, 99); see also, Tower Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523 (2d Cir. 1990).  Even if the contract does

---

[13]  Notwithstanding plaintiff's contentions to the contrary, defendant did not breach by anticipatory repudiation as a result of its failure to provide plaintiff with adequate assurance of performance.  Although plaintiff made an oral demand for assurance of performance upon defendant, plaintiff did not make the requisite written demand, and hence it was not incumbent upon defendant to provide assurance of due performance.  KAN. STAT. ANN. § 84-2-609(1); LNS Inv. Co. v. Phillips 66 Co., 731 F.Supp. 1484, 1487 (D.Kan. 1990) ("To suspend its performance, pursuant to [KAN. STAT. ANN. § 84-2-609], defendant must . . . have demanded in writing adequate assurance of plaintiff's future performance . . ."); see also, Chronister Oil Co. v. Unocal Refining & Mktg., 34 F.3d 462, 464 (7th Cir. 1994).

not state that time is of the essence, and does not set a specific date for performance, a finding that time was of the essence is appropriate "where there [is] something in the nature of the subject matter, or connected with the purpose of the contract and the circumstances surrounding it which makes it apparent that the parties intended that the contract be performed at or within the time specified."  See, Chronister Oil Co. v. Elleron Chems. Corp., 1986 WL 13445, at *3 (S.D.Tex. Nov. 21, 1986); see also, Hochard v. Deiter, 549 P.2d 970, 974 (Kan. 1976) ("Time is not ordinarily regarded as of the essence of a contract unless it is so stipulated by the express terms or is necessarily implied from the character of the obligations assumed."); Morton v. Sutcliffe, 266 P.2d 734, 736 (Kan. 1954) (even though a contract does not contain a provision that time is of the essence, such a finding may be appropriate where the intentions of the parties disclose that time was of the essence.).  Contracts involving the sale of oil are customarily considered to be time of the essence contracts because oil is the type of commodity that will fluctuate in value.  Chronister Oil Co., 1986 WL 13445, at *3; see also, Steuart Petroleum Co., 1989 WL 100517, at * 9 ("In that the present case involves the trading of oil cargoes with rapidly changing prices, I hold as a matter of law time to be of essence.").

Plaintiff bargained for and received the contractual right to demand delivery of the oil on a date chosen by plaintiff within the agreed-upon delivery window.  Additionally, defendant knew, as early as January 26th, that plaintiff needed the oil to be delivered to Castle by February 3rd.  From January 26th until February 3rd, plaintiff had emphatically stressed to defendant that plaintiff urgently needed the oil to be delivered by February 3rd.  Throughout this period, defendant's only response was that it was making every attempt to deliver the cargo by February 3rd, and defendant never even remotely suggested it was unaware that it was vital that delivery

16

occur on that date.

Since time was of the essence in the performance of the parties' contract, defendant's late delivery violated the perfect tender rule because defendant's "tender of delivery fail[ed] in *any respect* to conform to the contract." KAN. STAT. ANN. § 84-2-601 (emphasis added); see also, KAN. STAT. ANN. § 84-2-106(2) ("Goods or conduct including any part of a performance are 'conforming' or conform when they are in accordance with the obligations under the contract."). On February 2nd, plaintiff advised defendant that Castle was threatening to purchase cover at a significantly higher price on the spot market if it could not obtain timely delivery of the cargo. On that date, plaintiff issued to defendant a written Notice of Protest indicating the defendant's failure to comply with its obligation to be able to load the oil by February 3rd renders it in breach of contract. Plaintiff further advised defendant that it would take all necessary and appropriate action to protect plaintiff's interests and to hold defendant fully liable for any and all resulting damages. In an attempt to mitigate its damages, plaintiff continued diligently working with defendant in an effort to obtain delivery by February 4th, the date plaintiff had a good faith belief that Castle would still be willing to accept the oil. Despite granting defendant this extension of time, defendant was unable to effectuate the belated delivery of the cargo on February 4th. As a result, plaintiff, by written notice, advised defendant that defendant's inability to load the oil until February 5th was completely unacceptable, and defendant has breached the contract. Plaintiff again informed defendant that it intended to hold defendant responsible for all costs and consequences resulting from defendant's nonperformance, including the cost incurred as a result of the need to purchase alternative cover in the spot market.

Defendant breached the contract by failing to deliver the oil on February 3rd or 4th. Under

17

the UCC, where the seller fails to make delivery, a buyer may cancel the contract, and whether or not the buyer cancels, the buyer may recover so much of the price as had been paid in addition to cover as to all goods affected.  KAN. STAT. ANN. § 84-2-711(1)(a).  In order for a buyer to recover the costs associated in purchasing cover, the buyer must make "in good faith[14] and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."  KAN. STAT. ANN. § 84-2-712(1).  "Failure of the buyer to effect cover [after the seller's breach of the contract by nondelivery] does not bar him from any other remedy."  KAN. STAT. ANN. § 84-2-712(3).

Defendant's nondelivery of the oil on February 3rd constituted an unequivocal breach of contract.  Despite the fact that plaintiff had notified defendant that it was in breach, plaintiff gave defendant, until February 4th, to make delivery.  Such an extension of time would afford plaintiff an opportunity to mitigate any damages it might incur as a result of defendant's breach.  See, Clark Oil Trading Co. v. J. Aron & Co., 659 N.Y.S.2d 426, 431 (N.Y. Sup. Ct. 1997) ("When there has been a breach of a contract, the law imposes a duty on the non-defaulting party to make reasonable efforts to reduce or extinguish the damage."), aff'd as modified, 683 N.Y.S.2d 12 (N.Y. App. Div. 1998).   Nevertheless, defendant was unable to timely deliver the oil pursuant to its contractual obligation, nor within the extended time period granted by plaintiff.  Castle did not

---

[14]  The general definition, in the UCC, for "'good faith' means honesty in fact in the conduct or transaction concerned."  KAN. STAT. ANN. § 84-1-201(19).  For purposes of Article 2 of the UCC, dealing with transactions in goods, "'[g]ood faith" in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  KAN. STAT. ANN. § 84-2-103(1)(b).  The defendant avers that it is "not aware of any conduct taken by [plaintiff] in its dealings with [defendant], that would constitute lack of good faith."  (Def.'s Mem. at 12).

purchase the cargo cover until after the estimated time that defendant anticipated delivering the oil on February 4th. As it turned out, defendant was unable to have the cargo ready to be lifted until the following morning, on February 5th. The arbitration panel unanimously agreed that plaintiff breached its contract with Castle thereby giving Castle "the right to cover by purchasing in the spot market which it did on the evening of February 4th. The Panel unanimously concludes that Castle Oil cover purchase was reasonable in light of the circumstances . . ." (Def.'s Rule 56.1 Statement, Ex. 168 at 1).

Defendant, however, argues that summary judgment in favor of plaintiff on the breach of contract claim is precluded because an issue of fact exists with regard to whether plaintiff timely rejected the late tender of the cargo. Additionally, defendant contends that, even if plaintiff rejected defendant's tender for being less than perfect, defendant had the right, under the UCC, to cure the defective tender which defendant claims it did.

In order for a buyer to effectively reject goods, in accordance with the perfect tender rule, the "[r]ejection of goods must be within a reasonable time after their delivery or tender" and "the buyer [must] seasonably notif[y] the seller." KAN. STAT. ANN. § 84-2-602(1). "If the buyer fails to make effective rejection, the buyer will be deemed to have accepted the goods." See, Y & N Furniture, Inc. v. Nwabuoku, 734 N.Y.S.2d 382, 385 (N.Y. Civ. Ct. 2001). The primary reason for the requirement of a notice of rejection is to provide the seller with an opportunity to cure or to allow the seller to attempt to minimize its losses. DeJesus v. CAT Auto Tech. Corp., 615 N.Y.S.2d 236, 238 (N.Y. Civ. Ct. 1994); see also, KAN. STAT. ANN. § 82-2-601, 1996 Kansas cmt. 1 (an exception to the perfect tender rule is the seller's right to cure.). With regard to the seller's right to cure, KAN. STAT. ANN. § 84-2-508(2) provides:

19

> [W]here the buyer rejects a nonconforming tender which the seller has reasonable grounds to believe would be acceptable with or without money allowance, the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender."[12]

"[T]he seller's right to cure a defective tender . . . was intended to act as a meaningful limitation on the absolutism of the old perfect tender rule, under which, no leeway being allowed for imperfection, there was, as one court put it, just 'no room * * * for the doctrine of substantial performance' of commercial obligations." T.W. Oil, Inc. v. Consol. Edison Co. of New York, Inc., 457 N.Y.S.2d 458, 463 (N.Y. 1982) (quoting Mitsubishi Goshi Kaisna v. J. Aron & Co., 16 F.2d 185, 186 (2d Cir. 1926)).

In the instant case, the nonconforming tender is that defendant failed to timely deliver the oil pursuant to a time of the essence contract.  Thus, it is impossible for defendant to cure the defective delivery by re-tendering the oil at an even later date.  Moreover, the damages suffered by plaintiff were incurred prior to defendant's belated delivery of the cargo.  See generally, Chemetron Corp. v. McLouth Steel Corp., 381 F.Supp. 245, 254 & n. 14 (N.D.Ill. 1974) (finding that "there is no requirement that the buyer give notice where there is nondelivery."  "'Where the seller has repudiated or failed to make a delivery, the buyer may proceed directly to a remedy. No rejection or notice is needed, most probably because the seller in these cases reasonably should know that he has not performed.'") (quoting Nordstrom, Handbook of the Law of Sales, at 425 (1970)), aff'd, 522 F.2d 469 (7th Cir. 1975).

---

[12]  Subdivision one of § 84-2-508 pertains to the seller's right to cure when "any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired . . . "  That subdivision is clearly inapplicable, to the case at bar, because defendant's time for performance had expired as of February 3rd.

Defendant advances two arguments why its failure to deliver the oil on February 3rd and February 4th should be excused. With regard to the February 3rd delivery date, defendant argues that Castle's February 2nd and February 3rd nominations of barge B-80 were invalid because the barge was not available, and hence it was impossible for defendant to perform.[13] It is undisputed that defendant did not possess the requisite amount of oil on February 3rd to fulfill its obligations under the contract. Moreover, on February 2nd, defendant advised plaintiff that it could not deliver the oil on February 3rd, and the parties further agreed to have the oil delivered on February 4th. Thus, the unavailability of the nominated barge, on February 3rd, did not serve as an impediment to defendant's ability to comply with its contractual obligation to deliver the cargo on February 3rd.

Defendant also maintains that its failure to deliver the oil on February 3rd and February 4th should be excused due to a force majeure event. The collision at the GATX Terminal was not the cause of defendant's failure to deliver the oil on February 3rd. Defendant quite simply did not have the necessary cargo to deliver to plaintiff on that date. More importantly, the force majeure defense fails because defendant did not provide plaintiff with notification of the force majeure event as defendant was required to do under the parties' contract.

Accordingly, with regard to the breach of contract cause of action, summary judgment in favor of the plaintiff is warranted.

Turning to the issue of damages, KAN. STAT. ANN. § 84-2-713, provides an alternative

---

[13] Plaintiff claims that barge companies routinely substitute barges, and that the unavailability of the barge B-80, on February 3rd, played no role in defendant's inability to deliver the oil that day.

means to determine damages where the buyer did not resort to purchasing cover.  KAN. STAT.

ANN. § 84-2-713, 1996 Kansas cmt. 1.  That section provides, in relevant part:

> (1) [T]he measure of damages for nondelivery or repudiation by the seller is the
> difference between the market price at the time when the buyer learned of the
> breach and the contract price together with any incidental and consequential
> damages provided . . ., but less expenses saved in consequence of the seller's
> breach.
>
>                                               *   *   *
>
> (2) Market price is to be determined as of the place for tender or, in cases of
> rejection after arrival or revocation of acceptance, as of the place of arrival.

Plaintiff contends that using the contract measure to determine damages, defendant is

liable for $1,769,670, plus prejudgment interest pursuant to N.Y. C.P.L.R. § 5001.  (Pl.'s Mem.

at 21).  Plaintiff maintains that:

> [T]he spot market price for Number 2 oil delivered at New York Harbor was
> $1.4678 on February 4, . . . as measured by Castle's cost of cover.  The difference
> between that and the contract price of .906 is $.5618.  For the 3,150,000 gallons
> that were not delivered, the damages are $1,769,670.00.[14] * * * [Defendant] has
> come forward with no evidence of any expenses saved. As a result, the damages
> are easily calculated at $1,769,670, together with interest at the statutory rate of 9
> per cent per year from February 3, 2000 to the present. (Id. at 21, 22).

Although the record supports plaintiff's calculations, plaintiff only sued defendant for

$1,700,656.68, which represents the amount of damages awarded to Castle in the arbitration

---

[14]  Plaintiff asserts that "Castle covered by purchasing in the spot market a total of
3,113,795 gallons." (Pl.'s Mem. at 21).  Plaintiff is seeking to recover damages associated with
the late delivery of 3,150,000 gallons of oil by defendant.  Plaintiff explains that "Castle's
arbitration award differs from the total damages here because Castle covered with fewer than
75,000 barrels, and because it claimed incidental and consequential damages which are not at
issue here." (Pl.'s Mem. at 22 n.37).

proceedings.[15]  Hence, plaintiff may not recover damages against defendant in an amount greater than plaintiff sought in its complaint.

Plaintiff also seeks prejudgment interest from February 3rd to the present, pursuant to N.Y. C.P.L.R. § 5001.  That section permits interest to be recoverable upon a sum awarded because of a breach of contract, from the earliest ascertainable date the cause of action existed.

The parties, however, agree that the contract was to be governed by federal laws and the law of Kansas.  The law of the state which was applicable in determining liability in the first instance, is applicable in determining whether an award of prejudgment interest is appropriate. See, In re Gaston & Snow, 243 F.3d 599, 609 (2d Cir. 2001) (applying Idaho law in determining whether to award prejudgment interest where parties agreed that, aside from statute of limitations, Idaho law governed the case.); see also, Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999) ("Under New York choice of law rules, the law of the jurisdiction that determines liability governs the award of prejudgment interest.); in accord, Entron, Inc. v. Affiliated FM Ins. Co., 749 F.2d 127, 131(2d Cir. 1984) (finding that under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of the state which was applied to determine liability on the main claim.).   Since, Kansas law, not New York law, controls in this action, N.Y. C.P.L.R. § 5001 is inapplicable.

Under Kansas law, the allowance of prejudgment interest is a matter of judicial discretion

---

[15]  Defendant asserts that, pending the outcome of the motions, it is reserving the right to offer a substantive challenge to the calculation of plaintiff's alleged damages.  Rather than disclosing a legitimate (or for that matter any) objection to plaintiff's calculation of damages, defendant simply grants itself the unilateral right to respond, at some later date, to the amount of damages that plaintiff claims is owing.  The record fails to disclose any evidence that plaintiff saved any expenses as a result of defendant's breach.

that may only be reversed when there is an abuse of discretion.  Miller v. Botwin, 899 P.2d 1004, 1011-12 (Kan. 1995) (citation omitted).  "The general rule of law in Kansas is that prejudgment interest is allowable on liquidated claims."  Royal College Shop, Inc. v. N. Ins. Co. of N.Y., 895 F.2d 670, 673 (10th Cir. 1990) (citation omitted).  "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation."  Kilner v. State Farm Mut. Auto. Ins. Co., 847 P.2d 1292, 1300 (Kan. 1993).  The amount of damages owing by defendant was neither fixed nor certain until this Court's finding that defendant is liable for $1,700,656.68 in damages for breach of contract.  Accordingly, plaintiff is not entitled to prejudgment interest.  See, Scherman v. Kansas City Aviation Ctr., Inc., 1994 WL 519042, at *8, 11 (D.Kan. Aug. 30, 1994) (A buyer entitled to recover, under UCC § 2-713, is precluded from obtaining prejudgment interest because the amount due for breach of contract was neither fixed nor certain prior to judgment), aff'd, 83 F.3d 433 (10th Cir. 1996).

## CONCLUSION

In light of the foregoing, plaintiff's motion for summary judgment is granted, and plaintiff shall have judgment against defendant in the amount of $1,700,656.68.[16]  Defendant's

---

[16]  Plaintiff did not move for summary judgment with regard to its estoppel claim alleging defendant "is equitably estopped from now claiming that the delivery under the Purchase Contract was not 'at buyer's option.'" (Compl. ¶ 52).  The granting of summary judgment in plaintiff's favor, on its breach of contract claim, renders the estoppel cause of action moot.

motion for summary judgment is denied.  The Clerk of the Court is hereby directed to close this case.

Dated: New York, New York
      August 30, 2005

SO ORDERED:

_____
GEORGE B. DANIELS
United States District Judge